# UNITED STATES DISTRICT COURT
## for the SOUTHERN DISTRICT OF INDIANA,
### INDIANAPOLIS DIVISION

| | |
|---|---|
| **KARNISHA M. WILLIAMS**, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| *vs.* | ) **CAUSE NO. 1:08-cv-1353-JMS-TAB** |
| | ) |
| **MICHAEL J. ASTRUE**, Commissioner of | ) |
| the  Social Security Administration, | ) |
| | ) |
| Defendant. | ) |

### ENTRY

In September 2005, plaintiff Karnisha Williams applied for disability benefits under both the Disability Insurance Benefits and the Supplemental Security Income programs of the Social Security Act.  The Social Security Administration found that she was not disabled and denied her applications.  Ms. Williams now sues for judicial review of those denials.  For the reason set forth herein, the denials are reversed and her applications are remanded to the Administration for reconsideration.

Review of the Commissioner's factual findings is deferential: the Court must affirm if they are supported by substantial evidence in the record.  42 U.S.C. § 405(g); *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004); *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003).  Substantial evidence is more than a scintilla, but less than a preponderance, of the evidence.  *Wood v. Thompson*, 246 F.3d 1026, 1029 (7th Cir. 2001).  If the evidence is sufficient for a reasonable person to conclude that it adequately supports the Commissioner's decision, then it is substantial evidence.  *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28

1

L.Ed.2d 842 (1971); *Carradine v. Barnhart*, 360 F.3d 751, 758 (7th Cir. 2004).  This limited

scope of judicial review derives from the principle that Congress has designated the

Commissioner, not the courts, to make disability determinations:

> In reviewing the decision of the ALJ, we cannot engage in our own analysis of
> whether [the claimant] is severely impaired as defined by the SSA regulations.
> Nor may we reweigh evidence, resolve conflicts in the record, decide questions of
> credibility, or, in general, substitute our own judgment for that of the
> Commissioner.  Our task is limited to determining whether the ALJ's factual
> findings are supported by substantial evidence.

*Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004).  *Carradine*, 360 F.3d at 758.  While

review of the Commissioner's factual findings is deferential, review of his legal conclusions is

*de novo*.  *Richardson*, *supra*.

Claimants who have achieved insured status through employment and withheld

premiums are eligible for Disability Insurance Benefits ("DIB"), 42 U.S.C. § 423, *et seq.*, while

Supplemental Security Income benefits ("SSI") are available for uninsured individuals who meet

certain income and resource criteria, 42 U.S.C. § 1381, *et seq.*  Not having a qualifying

employment record herself, Ms. Williams's DIB application is for child disability benefits under

one of her parents' insured records.[1]  A dependent, unmarried, adult child of an insured

individual is eligible for DIB benefits if the child's disability began before she reached the age of

22 years.[2]  20 C.F.R. §  404.350(a).  Therefore, in order for Ms. Williams to be eligible for DIB

---

[1] Because the application records are missing from the administrative record, we rely on
the ALJ's and the parties' descriptions, see, *e.g.*, (R. 12, 54).

[2] There is an indication in the Record that Ms. Williams was granted disability benefits
— presumably, child DIB benefits — in July 1995, when she was 14 years old, and that those
benefits were terminated in October, 2000, when she was 19 years old.  (R. 132).  Neither the
impairments that were found disabling at that time nor the reasons for termination of the benefits

benefits, her disability must have begun before April 31, 2003.  She also applies for adult SSI

benefits.  The same substantive standard of disability applies to both child DIB and adult SSI

benefits.

Under the Social Security Act, disability is defined as the "inability to engage in any

substantial gainful activity by reason of any medically-determinable physical or mental

impairment which can be expected to result in death or has lasted or can be expected to last for a

continuous period of not less than 12 months".  42 U.S.C. §§ 416(I) and 423(d)(1)(A).  A person

will be determined to be disabled only if his impairments "are of such severity that he is not only

unable to do his previous work but cannot, considering his age, education, and work experience,

engage in any other kind of substantial gainful work which exists in the national economy."  42

U.S.C. § 423(d)(2)(A).  The combined effect of all of a claimant's impairments shall be

considered throughout the disability determination process.  42 USC § 423(d)(2)(B).

The Social Security Administration ("SSA") has implemented these statutory standards

in part by prescribing a "five-step sequential evaluation process" for determining disability.  20

C.F.R. § 404.1520.  If disability status can be determined at any step in the sequence, an

application will not be reviewed further.  *Id.*  At the first step, if the claimant is currently

engaged in substantial gainful activity, then he is not disabled.  At the second step, if the

claimant's impairments are not severe, then he is not disabled.  A severe impairment is one that

"significantly limits [a claimant's] physical or mental ability to do basic work activities."  20

---

are apparent.  The Social Security Act requires periodic reviews of a benefit recipient's
eligibility, called Continued Disability Reviews.

C.F.R. § 404.1520(c).  Third, if the claimant's impairments, either singly or in combination, meet or equal the criteria of any of the conditions included in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, then the claimant is deemed disabled.  The Listing of Impairments are medical conditions defined by criteria that the SSA has pre-determined are disabling.  20 C.F.R. § 404.1525.  If the claimant's impairments do not satisfy a Listing, then his residual functional capacity ("RFC") will be determined for the purposes of the next two steps.  RFC is a claimant's ability to do work on a regular and continuing basis despite his impairment-related physical and mental limitations.  20 C.F.R. § 404.1545.  At the fourth step, if the claimant has the RFC to perform his past relevant work, then he is not disabled.  Fifth, considering the claimant's age, work experience, and education (which are not considered at step four), and his RFC, he will not be determined to be disabled if he can perform any other work in the relevant economy.

The burden rests on the claimant to establish steps one through four.  The burden then shifts to the Commissioner at step five to establish that there are jobs that the claimant can perform in the national economy.  *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).  If a claimant has only exertional limitations, the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2 (the "grids"),  may be used at step five to arrive at a disability determination.  The grids are tables that correlate a claimant's age, work experience, education, and RFC with predetermined findings of disabled or not-disabled.  20 C.F.R. §§ 404.1569 and 1569a.  If a claimant has non-exertional limitations or exertional limitations that restrict the full range of employment opportunities at his RFC level, then the grids may not be used and a

vocational expert must testify regarding the numbers of jobs existing in the economy for a person

with the claimant's particular vocational and medical characteristics.  *Id.*; *Lee v. Sullivan*, 988

F.2d 789, 793 (7th Cir. 1993).  The grids result, however, may still be used as an advisory

guideline in such cases.  20 C.F.R. § 404.1569.

An application for benefits, together with any evidence submitted by the applicant and

obtained by the agency, undergoes initial review by a state-agency disability examiner and a

physician or other medical specialist.  If the application is denied, the claimant may request

reconsideration review, which is conducted by different disability and medical experts.  If denied

again, the claimant may request a hearing before an administrative law judge ("ALJ").[3]  A

claimant who is dissatisfied with the decision of the ALJ may request the national Appeals

Council to review the decision.  If the Appeals Council either declines to review or affirms the

decision, then the claimant may file an action in district court for judicial review.  42 U.S.C. §

405(g).  If the Appeals Council declines to review a decision, then the decision of the ALJ

becomes the final decision of the Commissioner for judicial review.

Ms. Williams alleges a disability due to mental retardation, since birth, and low back

pain.  (An alleged onset date for her low back pain was not found in the Record.)  Although she

has had brief, temporary jobs, she has never engaged in substantial gainful activity.  At the time

---

[3] Initial and reconsideration reviews in Indiana are performed by an agency of the state
government — the Disability Determination Bureau, a division of the Indiana Family and Social
Services Administration — under arrangement with the Social Security Administration.  20
C.F.R. Part 404, Subpart Q (§ 404.1601 *et seq.*).  Hearings before ALJs and subsequent
proceedings are conducted by personnel of the federal SSA.

of the ALJ's hearing, Ms. Williams was 26 years old, a high-school graduate, single, and a mother of 5 children living with her.  She was in special-education classes all through school and was held back at least twice.  At the hearing, Ms. Williams testified that a disc in her back causes pain to her left leg, she has a problem with her right ankle bone, and her right leg is weak and gives out on her sometimes.  (R. 158).  She testified that she was not able to maintain a job because she could not stand long enough.  (R. 159-60).  She asserted that she has a learning disability and, when asked how it affects her, she answered that it makes it hard for her to "catch on to certain things."  (R. 156).   She is not on any medications and has had no medical procedures performed on her for her back pain.

Ms. Williams underwent periodic mental testing and evaluation during her school years. Testing done in September 1995 produced a verbal IQ score of 72, performance IQ of 75, and a full-scale IQ of 71.  Testing done in January 1999 was interpreted as showing that her intellectual ability and academic skills were in the mildly mentally handicapped range and her adaptive skills were at a higher-than-expected level.  (R. 81, 94-95, 98).  In a March 1999 high-school case-conference report, the case committee listed her as having a mild mental handicap based on the January 1999 testing.  (R. 80, 82).

In August 1999, when Ms. Williams was 18 years old, the state agency had her evaluated by a consulting psychologist, Dr. Herman.[4]  (R. 165).  Dr. Herman found her intellectual

---

[4] This examination occurred before Ms. Williams filed her current application for benefits and, presumably, it was part of a continued disability review of her previous award of benefits.

functioning to be in the extremely low range, with a full-scale IQ of 67, verbal IQ of 69, and

performance IQ of 70.  (R. 166).  He gave an Axis-II diagnosis[5] of borderline intellectual

functioning and assigned her a current and highest-last-year Global Assessment of Functioning

("GAF") score of 78.[6]  Dr. Herman concluded that Ms. Williams had a low level of intellectual

functioning but he did not diagnose mental retardation because of her high adaptive functioning

level.  He specifically noted the facts that she cared for her infant daughter adequately (she had

only the one child at the time), performed several chores around the house, demonstrated an

ability to work extremely quickly, learned rules and meaningful symbols rapidly, followed

directions well, asked appropriate questions, and made her needs known.  He found that she

could handle her own finances in her own best interest.  (R. 165-66).

As part of her current application for benefits, the state agency had Ms. Williams

evaluated by another psychologist, Dr. Vandivier, in October 2005.  Testing produced a verbal

IQ of 61, a performance IQ of 62, and a full-scale IQ of 58, all of which Dr. Vandivier

characterized as falling in the "extremely low" range.  As did Dr. Herman, Dr. Vandivier made

---

[5] An Axis I diagnosis records clinical disorders and other disorders that might be a focus
of clinical attention; Axis II records personality disorders and mental retardation; Axis III
records general medical conditions; Axis IV records psychosocial and environmental problems;
and Axis V records a Global Assessment of Functioning score.  American Psychiatric
Association, *Diagnostic and Statistical Manual of Mental Disorders*, Fourth Edition, Text
Revision ("*DSM-IV-TR*"), at 27-34 (2000).  Dr. Herman made no Axis I or III diagnosis.  For
Axis IV, he noted only "Recent parenthood" as a psycho-social and environmental problem.  (R.
166).

[6] A GAF score of 71 to 80 means:  "**If symptoms are present, they are transient and
expectable reactions to psycho-social stressors** (e.g., difficulty concentrating after family
argument); **no more than slight impairment in social, occupational, or school functioning**
(e.g., temporarily falling behind in schoolwork)."  *DSM-IV-TR* at 34.

no Axis I or III diagnosis. He gave a "provisional" diagnosis of mild mental retardation at Axis II. Based on Ms. Williams's reports, he described her Axis IV psycho-social and environmental problems as unemployment, limited funds, low academic functioning, and pregnancy with her fourth child. He gave no GAF scores. (R. 101-04). Dr. Vandivier concluded that, based on Ms. Williams's statements and test results (if valid), she had significant adaptive behavior deficits in communications skills and functional academic skills. (R. 104).

The state agency also had Ms. Williams's back problem evaluated by a neurologist, Dr. Budzenski, in December 2005. He found her range of motion in the lumbar back to be well-preserved, the deep tendon reflexes brisk, and the sensory and motor modalities preserved, and, therefore, no evidence of nerve-root impingement. He concluded: "In regard to the workplace, based on today's clinical examination, there are no physical findings on today's examination that would suggest the need for work place restrictions." (R. 124-28).

In January 2006, Dr. Kladder, a state-agency consulting psychologist, reviewed the evidence on Ms. Williams's mental impairment and recorded his medical opinion on a standard Psychiatric Review Technique Form. (R. 105). He evaluated her impairment under the Listing criteria for mental retardation, 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05. Although he found sufficient evidence to substantiate the presence of the disorder, Dr. Kladder found that none of the four possible severity signs were present. (R. 109, 115). Specifically, he found that, in the four categories of functional abilities, Ms. Williams had no episodes of decompensation; was only mildly limited in restrictions of daily living and social functioning; and only

moderately limited in maintaining concentration, persistence, or pace.  (R. 115).[7]  He thus found that Ms. Williams's mental impairment did not satisfy the Listing.  He concluded that her impairment was borderline intellectual functioning.  (R. 109).

Dr. Kladder also completed a Mental Residual Functional Capacity Assessment form in which he rated Ms. Williams's limitations in twenty functions.  (R. 119).  He rated her as not significantly limited in all but four and, in these four — understanding and remembering detailed instructions, carrying out detailed instructions, maintaining attention and concentration for extended periods, and setting realistic goals or making plans independently of others — he rated her as only moderately limited.  (R. 119-20).  In the final narrative functional assessment, he wrote that, although Ms. Williams had a provisional diagnosis of mental retardation (by Dr. Vandivier), her previous IQ scores, school record, activities of daily living, and mental status examinations all pointed toward a correct diagnosis of only borderline intellectual functioning. (R. 121).  Dr. Kladder's ratings were reviewed and affirmed in March 2006 by Dr. Shipley, Ph.D. (specialty unknown), another state-agency reviewing physician.

In January 2006, a state-agency disability examiner, psychologist (Dr. Kladder), and physician (specialty unknown) reviewed the Record evidence on initial review of Ms. Williams' application for DIB benefits.  They recorded their consensus opinion on a check-box form that she had a primary diagnosis of mental retardation and a secondary diagnosis of disorders of the back, discogenic and degenerative, but that she was not disabled before age 22.  (R. 36).  In

---

[7] The possible degrees of limitation are, in order:  none, mild, moderate, marked, and extreme.  There is also an option of "insufficient evidence."

March, 2006, different state-agency experts in the same fields conducted a reconsideration review of the evidence and recorded the same opinions.  (R. 35).

After the state agency denied Ms. Williams's application for DIB benefits on initial and reconsideration reviews, (R. 49, 41),[8] she received a hearing before an ALJ, (R. 146, 152), who also denied her claim application.  (R. 12).  The Appeals Council then denied her request for review, (R. 4), making the ALJ's rationale the one that we review.

At step one of the sequential evaluation process, the ALJ determined that Ms. Williams has never engaged in substantial gainful activity.  At step two, he found that she suffered from the severe impairments of borderline intellectual functioning and low back pain.  At step three, he found that she has not had an impairment or combination of impairments that satisfied any of the Listings of Impairments.  He specifically considered whether she met Listing 12.05 for mental retardation.

For the purpose of his step-five determination,[9] the ALJ was required first to determine Ms. Williams's residual functional capacity ("RFC").  He found that, up to the time of his

---

[8] The administrative record contains no documents relating to the state-agency's processing of Ms. Williams's application for SSI disability benefits (*e.g.*, state-agency medical and disability specialists' opinions and formal decision notices on initial and reconsideration reviews).  Although the same substantive disability standard applies under both programs in this case, Ms. Williams's eligibility for SSI benefits does not depend on her disability commencing before she reached the age of 22.  Because no issue was made of this deficiency in the Record, we assume that proper procedures were followed and that Ms. Williams's application for SSI benefits is property before us.  The ALJ specifically found that Ms. Williams was not disabled at any time since her birth.  (R. 19-20).

[9] Because Ms. Williams has no past relevant work, step four is immaterial.

decision, she had the RFC to perform the full range of medium work, except that she had a non-exertional limitation — her mental impairment — that limits her to simple, routine tasks.  To make this determination, the ALJ had to evaluate the credibility of Ms. Williams's reports of the intensity, persistence, and functionally limiting effects of her symptoms.  He found that she was not credible to the extent that her alleged symptoms were inconsistent with the RFC to do simple, routine medium work on a sustained basis.

At step five, considering Ms. Williams's age ("younger individual," age 18 through 49),[10] education (high-school graduate), work experience (none, no transferable skills), and RFC for medium work, and using the grids as a framework — specifically Rule 203.28 — the ALJ found that Ms. Williams was not disabled.  Neither a medical nor a vocational expert testified at the hearing.

### Due Process

In an argument that Ms. Williams's counsel has raised several times in this Court, Ms. Williams contends that she was denied Constitutional due process of law as a result of an "institutional-agency wide policy and procedure of only selectively considering the evidence in the record so as to exclude from the ALJ's decision any of the evidence which proves a claimant's disability.   The agency and its ALJ simply pretend that there is no evidence in the record to prove the claimant's case."  She asserts that the agency's ALJs refuse to acknowledge claimants' evidence and arbitrarily rubber-stamp state agencies' denials.  (Plaintiff's Brief in

---

[10] 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(h)(1).

Support of Complaint (doc. 24) ("Brief"), at 15-16).  Ms. Williams does not identify any

evidence of a "policy and procedure" for ALJs to selectively consider or exclude evidence

tending to prove disability or that ALJs have a routine practice of pretending that there is no

evidence favoring claimants.[11]  She also fails to provide any legal support explaining and

applying the standard to be applied to institutional due-process claims.  The three cases that she

cites provide no support.  Two, *Smith v. Secretary of Health, Education and Welfare*, 587 F.2d

857, 859 (7th Cir. 1978), and *Smith v. Apfel*, 231 F.3d 433, 438 (7th Cir. 2000), do not mention

due process.[12]  The third, *Ray v. Bowen*, 843 F.2d 998, 1007 (7th Cir. 1988), reversed and

remanded a claim because the ALJ failed to obtain a retroactive psychological examination of

the claimant to determine if disabling alcoholism existed at the relevant time period.  After

comparing the situation to a trial judge's due-process obligation to obtain a retroactive

examination of a litigant who was possibly incompetent at the time of trial, the Court held that,

"[t]hough [disability claimant] has no analogous due process right to disability benefits, we

believe that he is entitled to a fair hearing on this claim and, ultimately, justice."  The court

offered no more due-process analysis or discussion with regard to disability evaluations.

Whether administrative determinations violate due process and, if so, whether a remedy is

---

[11] Williams counsel has repeatedly made similar unsupported arguments in cases pending in this District, without success.  His continued inclusion of them is unreasonable, and will be considered as such should the Court be asked to determine an appropriate fee in this case.

[12] *Smith v. Secretary* faulted an ALJ's failure to explain with sufficient detail and care the role and advantages of a lawyer to a mentally infirm, unrepresented claimant and the ALJ's failure to fully develop the record when the claimant was unrepresented.  It did not address due process.  *Smith v. Apfel* held that an ALJ failed to fully develop the record and failed to consider some of claimant's contrary evidence, but not within a due-process framework.  Both decisions were based on statutory and regulatory grounds.

available beyond the benefit at issue, are complex questions of fact and law.  *See*, *e.g.*, *Liteky v. United States*, 510 U.S. 540, 555-56 (1994);  *Schweiker v. Chilicky*, 487 U.S. 412 (1988).  It is not a  *per se* due-process violation for an ALJ to reject evidence supporting a finding of disability, to not specifically discuss all of the evidence, or to reject a claimant's assertion that a medical expert is required.  The Court will not assume Ms. Williams's burden to research the law of due process, search the record for possible violations, and construct a focused, logical, and persuasive argument applying the law to the facts. Without developed factual or legal support, William's institutional due-process argument fails.[13]

### Medical advisor

Ms. Williams argues that the ALJ erred by failing to call a medical advisor, specifically a psychologist, to testify regarding whether her combined impairments equaled a Listing.  Without such expert opinion, she contends, the ALJ improperly relied on his own layman's opinion.  On the contrary, the ALJ did have expert medical evidence on the issue of Listings equivalence in the form of Drs. Kladder's and Shipley's reviews of the record evidence and their recorded opinions that Ms. Williams's impairments did not meet or equal a Listing.  (R. 35, 36, 109, 115, 119-21).  Ms. Williams made no argument or showing that their opinions were insufficient or faulty and that the ALJ abused his discretion in not obtaining additional medical opinion on equivalence.

---

[13] In addition, Ms. Williams fails to demand or define a remedy for such an official, agency-wide deprivation of due process.  She asks only for the granting of her application for disability benefits, a remedy that is fully available under the Social Security Act and regulations.

**Mistated, argued-with, and rejected evidence**

Ms. Williams argues that the ALJ ignored several items of evidence and mistated or misconstrued Dr. Vandivier's report.  Because the ALJ's consideration of the evidence was thus incomplete, according to her, it is not supported by substantial evidence.  Of the 14 reports or documents that Ms. Williams contends the ALJ ignored or mistated, 9 are not part of the Record in this case.  (The Court will refer to them as the "missing exhibits," for convenience, without implying a ruling on whether they were, or should have been, part of the administrative record.) She asserts that the ALJ admitted the missing exhibits into the record, that she obtained copies of them from the SSA's Office of Adjudication and Review, and that she relied on and mentioned the missing exhibits in her pre-hearing memorandum to the ALJ.  The Commissioner contends that the missing exhibits were never submitted or admitted and are therefore not part of the official administrative record to which our review is limited.  The missing exhibits are not included in the Record's exhibits index; they don't bear Record pagination numbers; and, while some of the missing documents bear handwritten exhibit identifiers, not all of them do, and some of those that do conflict with identifiers already in the Record.  The ALJ does not mention the missing exhibits in his decision and neither does he address any information included within the exhibits.  The Court separately addresses the issue of these missing exhibits below.  Here the Court will address Ms. Williams's arguments pertaining to only the five exhibits that are part of the Record filed in this case.

**Exhibit 2F (R. 91).**  Ms. Williams argues that the ALJ ignored the January 25, 1999 school special education placement case conference report.  But the ALJ did not ignore Exhibit

14

2F because he not only cited it specifically, but also described some of its contents.  (R. 14).  If Ms. Williams intended to argue, instead, that the ALJ should have mentioned and/or addressed the significance of certain information in the Exhibit that she specified, then she failed to factually and legally support her argument.  Because an ALJ is not required to address every exhibit and every discrete item of information in every exhibit, it was incumbent on Ms. Williams to demonstrate the significance of the specified information and why the ALJ was required to address it.  This she did not do.

**Exhibit 1F (R. 80).**  Ms. Williams argues that, while the ALJ mentioned her high school's special education department's Case Conference Report Form, he "refused to consider the report as evidence of disability," although he gave this description of it:

> Indianapolis Public School records dated March 23, 1999, indicated claimant was in the 11th grade and participated in special education classes in all subjects due to mild mental handicap.

(R. 14).  There is no indication in the ALJ's decision that he refused to consider this report as evidence on the subject of Ms. Williams's disability.  His specific citation of it and description of its contents is, without more, sufficient evidence that he considered it.

**Dr. Herman's report (R. 165).**  Dr. Herman, a psychologist, examined Ms. Williams in August 1999 (before her current application was filed) on request of the state agency.  (R. 15).  Ms. Williams argues that the ALJ only selectively considered Dr. Herman's report because the ALJ ignored — meaning, he did not mention — two statements therein:  Dr. Herman wrote that Ms. Williams did not know how to spell her middle name, (R. 165, first paragraph),  and she appeared to have some difficulty understanding some of what was said to her, (*id*., third

paragraph).  The ALJ well-described several of Dr. Herman's findings and conclusions in his two-page report, (R. 15), and that is sufficient to demonstrate that the ALJ read and considered all of the report in making his determination.  Ms. Williams has not shown that the ALJ ignored (intentionally or otherwise) parts of the report.  What she really argues, in essence, is that the two identified passages had such significance bearing on the issue of her mental disability that the ALJ was required to specifically articulate his evaluation of them.  But Ms. Williams has not shown how an inability on that one occasion to spell her middle name or how some unidentified type of difficulty in understanding some unspecified information had such significance compared to the other information, data, and opinion in Dr. Herman's report that the ALJ was required to separately and explicitly address it.  Dr. Herman himself drew no explicit conclusions or inferences from these two facts.  The ALJ accurately described Dr. Herman's conclusions and final opinion and, without more, we assume that any inferences he drew from the two facts were incorporated into those conclusions and opinion.

Ms. Williams then argues with the substance of Dr. Herman's findings and conclusions and the ALJ's reliance thereon.  Specifically, she faults Dr. Herman's decision to make a diagnosis of borderline intellectual functioning instead of mental retardation due to what he found was her high adaptive functioning level which, she asserts, was based on faulty information reported by herself regarding her activities of daily living.  Ms. Williams contends that the ALJ was well-aware that her actual performance of daily activities contradicted Dr. Herman's assumptions.  We address this challenge to the ALJ's reliance on Dr. Herman's report below, as it affects the ALJ's credibility finding.

16

**Function Report — Adult Third Party (R. 69).**  This is a state-agency questionnaire completed by Ms. Williams's mother that primarily asks about Ms. Williams's daily activities and functional abilities.  It was completed in September 2005 as part of Ms. Williams's current application for benefits.  Ms. Williams argues that the ALJ ignored this evidence and it is true that he does not mention it, or its contents, in his decision.  Ms. Williams has shown the significance of this evidence:  it is a third-person, first-hand account of Ms. Williams's daily activities and functional abilities by a person who has had an opportunity to observe her behavior over the long term.  Her mother's descriptions are specific and directly contradict the assumptions made by reviewing and examining consultants and, at times, Ms. Williams's own faulty descriptions to those consultants of her abilities.  It is also the only evidence of this type in the Record submitted to the Court (and, we assume, reviewed by the ALJ), except for Ms. Williams's own hearing testimony.  As such, the ALJ was required to, not only mention it, but articulate his evaluation of it in relationship to the medical evidence that it contradicts.  The ALJ committed error by failing to do so.

**Exhibit 5F (R. 101).**  This exhibit is Dr. Vandivier's report of his consulting examination of Ms. Williams in October 2005 for the purposes of her current application.  Ms. Williams argues that the ALJ misinterpreted Dr. Vandivier's "provisional" diagnosis of mild mental retardation to mean "invalid" because he ignored Dr. Vandivier's stated reasons for making his diagnosis provisional.

Dr. Vandivier explained the reasons for his qualified diagnosis of "Mild Mental Retardation, Provisional:"

17

> Please note that the claimant was disengaged and did not appear to be trying her best during WAIS-III [IQ] testing.  Also, no reports from outside agencies were available to verify reduced cognitive functioning during the developmental period.  Finally, the mother reportedly is living independently with three children, which would probably be difficult for someone with a measured full-scale IQ of 58.  For all of these reasons, the diagnosis of mild mental retardation is made provisional.

(R. 103).  The ALJ wrote that "Dr. Vandivier opined the clamant was disengaged and appeared . . . not to put forth her best effort during WAIS-III testing, therefore test results is [*sic*] not considered valid."  He also noted that the lack of child-development reports and Ms. Williams's apparently inconsistent ability to live independently with her children also rendered Dr. Vandivier's diagnosis provisional.  (R. 15).  Relying on dictionary definitions, Ms. Williams argues that Dr. Vandivier's use of "provisional" means that his diagnosis was only "temporary," rather than "invalid."  How this helps her is obscure, however.  Either way, Dr. Vandivier explicitly and significantly qualified the diagnosis of mild mental retardation.  In effect, he stated that it could not be relied upon because he was not confident of its accuracy due to Ms. Williams's evident lack of cooperation, the absence of additional information that he thought was necessary, and the inconsistency of the diagnosis with the evidence of Ms. Williams's actual functional ability.

Ms. Williams also argues that the ALJ "simply ignored" Dr. Vandivier's final conclusion that she had "significant deficits in adaptive behavior, communication skills and functional academic skills."  (Brief at 27).  The quoted phrase is, indeed, in Dr. Vandivier's report, but the full quote is:  "Based on verbal statements made during the session and test results, *assuming the latter are valid*, the claimant has significant adaptive behavior deficits in communication skills and functional academic skills."  (R. 104 (emphasis added)).  Here, again, Dr. Vandivier

explicitly qualified his opinion, expressing its inconclusiveness or unreliability, and there is no evidence that the ALJ ignored it.[14]

## Credibility finding

Ms. Williams generally argues that the ALJ's credibility findings are erroneous because (1) they are contrary to the controlling evidence in the record that he either ignored or arbitrarily rejected, (2) the ALJ failed to follow the requirements of Social Security regulations, and (3) his credibility finding is based on a misstatement of Ms. Williams's testimony.  However, she specifies only two errors:  first, that the ALJ erroneously found that she was able to live independently and, second, that he failed to consider the seven factors that Social Security Ruling 96-7p requires to be considered when making a credibility determination.

Because of the inherent difficulty in evaluating a claimant's disability that is attributable in part to subjective experiences such as pain and mental impairments, the SSA has established a specific protocol for the evaluation of symptoms.  A basic principle underlying this protocol is that "symptoms cannot be measured objectively through clinical or laboratory diagnostic techniques . . . ."  Social Security Ruling ("SSR") 96-7p (Policy Interpretation — Medical Evidence).  20 CFR § 404.1529(c)(3).  Because there are no objective medical tests for the existence or severity of subjective symptoms, objective medical evidence can, at best, provide indirect evidence of symptoms by detecting and measuring physical or functional effects of the

---

[14] Ms. Williams concluded her argument with citations to cases holding that treating physicians' opinions should be given controlling weight if well-supported by medical findings and not inconsistent with other substantial evidence in the record.  While this principle is accurate, it is inapposite because, not only did Dr. Vandivier explicitly *not* give a diagnosis of mental retardation, he was not a treating physician.

symptoms.  *Id.*; 20 CFR § 404.1529(c)(2).  Another fundamental principle underlying symptom evaluation in the regulations is the idiosyncratic nature of the perception and effects of subjective symptoms.  Individuals can not only feel significantly-different intensities of a symptom resulting from the same impairment, but their functional limitations resulting from the same level of a symptom can differ significantly as well.  SSR 96-7p.[15]

By regulation and internal rulings, the SSA has incorporated these principles into a protocol for the evaluation of subjective symptoms:

> [S]tatements about your pain or other symptoms will not alone establish that you are disabled;  there must be medical signs and laboratory findings which show that you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence (including statements about the intensity and persistence of your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled.

20 CFR § 404.1529(a).  This two-step protocol thus prescribes an initial objective threshold inquiry to ensure the existence of the required causal impairment.  Then guidelines and factors are provided to direct adjudicators' second-step evaluations of the credibility of claimants' allegations of the degree of symptoms and limitations experienced.  The second step of the protocol requires that all available evidence be considered in determining credibility; objective medical evidence is not accorded determinative weight:

> When the medical signs or laboratory findings show that you have a medically determinable impairment(s) that could reasonably be expected to produce your

---

[15] "[A]djudicators must recognize that individuals may experience their symptoms differently and may be limited by their symptoms to a greater or lesser extent than other individuals with the same medical impairments and the same medical signs and laboratory findings."  SSR 96-7p (Policy Interpretation).

symptoms, such as pain, we must then evaluate the intensity and persistence of your symptoms so that we can determine how your symptoms limit your capacity for work.  In evaluating the intensity and persistence of your symptoms, we consider all of the available evidence, including your medical history, the medical signs and laboratory findings and statements from you, your treating or examining physician or psychologist, or other persons about how your symptoms affect you.

20 CFR § 404.1529(c)(1).  While the SSA will always seek and consider objective medical

evidence — defined as "evidence obtained from the application of medically acceptable clinical

and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm,

sensory deficit or motor disruption" — it "will not reject your statements about the intensity and

persistence of your pain or other symptoms or about the effect your symptoms have on your

ability to work solely because the available objective medical evidence does not substantiate

your statements." *Id.*, § 404.1529(c)(2).  Claims reviewers must consider all other relevant

evidence, including evidence on the following factors:

> (I)  Your daily activities;
> (ii)  The location, duration, frequency, and intensity of your pain or other symptoms;
> (iii)  Precipitating and aggravating factors;
> (iv)  The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
> (v)  Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
> (vi)  Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.);
> (vii)  Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

*Id.*, § 404.1529(c)(3).

> After examining all the evidence, the adjudicator makes a credibility determination:

> We will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between your statements and the rest of the

evidence . . . .  Your symptoms, including pain, will be determined to diminish your capacity for basic work activities to the extent that your alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence.

20 C.F.R. § 404.1529(c)(4).  SSR 96-7p provides guidance on adjudicators' evaluation of credibility based on internal and external consistency, medical evidence, medical treatment history, observations of the claimant, and other sources.

The ALJ found that Ms. Williams's impairment could reasonably be expected to produce her alleged symptoms but he found that she was not credible regarding the extent of the functional limitations that those symptoms imposed.  He found that she had no exertional limitation on her ability to work and Ms. Williams does not contest this finding.  He then articulated the reasons why he found her not credible regarding the extent of her functional limitations caused by her mental impairment:

> Although current WAIS IQ results showed Full Scale IQ of 58, the examining psychologist, opined test result [*sic*] invalid due to poor effort; and offers provisional diagnosis of mild mental retardation.  Dr. Vandivier opined it would be difficult for someone with a measured Full Scale IQ of 58 to independently take care of 3 children (Exhibit 5F). . . .  The claimant is capable of performing all activities of daily living; and she takes care of her 5 children: ages 8, 6, 5, 2, and 1-years old, with the help of her mother. . . .  She takes no medication for low back pain or any other condition.  Based on the objective evidence of record, I find the claimant retains the residual functional capacity to perform simple routine tasks on a sustained basis.  I give great weight to the consultative exam reports at Exhibits 5F [Dr. Vandivier's report], 9F [Dr. Budzenski's neurological report].

> As for the opinion evidence, I agree with the medical consultant's opinion at Exhibits 6 [6F, Dr. Kladder's Psychiatric Review Technique form] and 7 [7F, Drs. Kladder's and Shipley's Mental RFC Assessment form], which are consistent with the substantial evidence of record.

(R. 18-19).

There are several problems with this explanation of the ALJ's credibility finding.  First, he mentioned, and discounted, only the IQ findings of Dr. Vandivier, but none of the other examination results and opinions showing mental retardation instead of only borderline intellectual functioning.  Second, the ALJ mischaracterized Dr. Vandivier as concluding that his results were invalid due to poor effort when the doctor actually wrote that his results were "provisional," in part because Ms. Williams was disengaged and appeared to not be trying her best.  In other words, Dr. Vandivier was not certain whether his test results were valid or invalid but, if they were valid, he opined that Ms. Williams had significant adaptive behavior deficits.  Third, the ALJ relied on Dr. Vandivier's observation that Ms. Williams's ability to independently take care of 3 children was inconsistent with a full-scale IQ of 58, yet the Record contains Ms. Williams's testimony and the function report of her mother to the (uncontradicted) effect that Ms. Williams does not independently take care of her children but requires ongoing, substantial assistance from her mother to perform even the most basic tasks for herself and her (now 5) children, including cooking, cleaning, laundering, dressing, and shopping.  Dr. Vandivier did not have the benefit of this evidence but the ALJ did and it was error for him to simply adopt what he knew to be Dr. Vandivier's uninformed — or less-informed — opinion about an inconsistency between Ms. Williams's daily activities and her alleged disabling mental retardation.  Fourth, the ALJ simply stated his conclusion that Ms. Williams is capable of performing "all activities of daily living" and taking care of her 5 children, "with the help of her mother," without offering any discussion of the actual evidence relating to these issues.  He was required to evaluate,  and articulate his evaluation of, that evidence because much of the expert medical opinion on which he relied to find that she was only borderline intellectual functioning

was expressly based on Ms. Williams's higher-than-expected adaptive functioning in daily life. Those medical opinions were made without access to this evidence of Ms. Williams's actual daily activities or the substantial assistance that she required.  But that evidence was indeed available to the ALJ, so he knew, or should have known, that it contradicted those parts of the medical opinions.  Fifth, the bare phrase "with the help of her mother" is far too weak to bear the weight the ALJ places on it.  By recognizing that Ms. Williams had help from her mother to take care of her children and perform her daily activities, the ALJ was required to determine the nature and extent of that help and the need for it before finding that her activities of daily living were inconsistent with disabling mental impairment.  Her mother described that she virtually had to supervise as well as assist with most of her daughter's daily activities, including her child care; accompany and assist her when shopping; and assist with mail and other business and financial matters.  The ALJ should not have ignored this evidence.

Finally, the ALJ undertook no analysis and made no findings regarding the ultimate question of whether Ms. Williams's ability to take care of her daily activities and care for her children, with substantial assistance from her mother, meant that she had the additional mental functional capacity to maintain sustained employment.  There was no discussion comparing the mental requirements for sustained work with her mental capacity to take care of her personal needs and care for her children with substantial assistance.  Because a person can take care of personal needs and care for her children in a home environment does not demonstrate, without more, that she can function in a workplace setting on a sustained basis.  Ms. Williams's testimony and her mother's report about her daily activities and the constant, substantial assistance that she received to perform them were uncontradicted in the Record.  Perhaps the

24

ALJ believed she did not need so much assistance.  But, if that were the case, then the ALJ had to articulate the basis for his belief, based on evidence in the Record.  Instead, he gave no explanation or evaluation supporting his bare conclusion about the significance of her daily activities to her disability.

The ALJ's credibility determination is not supported by substantial evidence in the Record.

### Step five determination

The ALJ found that Ms. Williams had the RFC for "the full range" of medium work, except that she was limited to "simple routine tasks."  (R. 19).  He then found that "the additional limitations have little or no effect on the occupational base of unskilled medium work."  (R. 20).  Using the grid table for medium work and factoring in Ms. Williams's age and education,[16] he applied  Rule 203.28 which directed a finding that she was not disabled.  Ms. Williams rightly complains that the ALJ had no medical expert opinion to support his finding that her mental impairment limited her only to simple, routine tasks and he had no vocational expert opinion to support his finding that a limitation to simple, routine tasks has little or not effect on the occupational base of unskilled medium work.  It is improper for the ALJ to make these expert findings on his own.  Therefore, the ALJ's step-five determination is not supported by substantial evidence and is compromised by legal error.

---

[16] Ms. Williams had no relevant work experience and, at that level of the table, whether a claimant's work experience is characterized as skilled or unskilled is irrelevant to the disability outcome.

**Missing exhibits**

Because we have found that the ALJ's decision is defective on the basis of the Record that was filed in this case, we need not address the status or effect of the missing records. Further, we are not in a position to resolve the factual dispute whether the records were submitted to and admitted by the ALJ but omitted from the official record.  There are indications both ways.  Significantly, however, Ms. Williams cited and discussed the missing exhibits in her pre-hearing memorandum to the ALJ which should have alerted him to their absence and prompted an inquiry about their status and/or a ruling on the record as to why they were excluded.  Because the Court is reversing and remanding this case to the Commissioner for reconsideration regardless, his is instructed on remand to make an on-the-record determination about whether the missing exhibits should be part of the administrative record.  Because the Court's review of the missing exhibits indicates that they contain substantial evidence on the issue of Ms. Williams's disability, if the Commissioner determines that they were, or should have been, part of the administrative record, then he must reevaluate Ms. Williams's applications on the basis of the complete record.

**Conclusion**

Because the Commissioner's decision denying Ms. Williams's application for disability benefits is not supported by substantial evidence and is based on material legal error, it is reversed and remanded with instructions for reconsideration.

06/29/2010

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

26

Distribution:

Thomas E. Kieper
Office of the United States Attorney
tom.kieper@usdoj.gov

Patrick Harold Mulvany
mulvany@onet.net